**TRANSKENTUCKY TRANSPORTATION RAILROAD, et al., Plaintiffs,**

v.

**LOUISVILLE AND NASHVILLE RAILROAD COMPANY, d/b/a The Family Lines Rail System, et al., Defendants.**

**Civ. A. No. 82–271.**

United States District Court,
E.D. Kentucky,
at Lexington.

June 28, 1983.

Jackson White, Stoll, Keenon & Park, Lexington, Ky., James P. Kennedy, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Fritz R. Kahn, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., for plaintiffs.

R. Eden Martin, G. Paul Moates, Sidley & Austin, Washington, D.C., Ben L. Kessinger, Jr., Stites & Harbison, Lexington, Ky., for defendants.

## MEMORANDUM OPINION AND ORDER

SCOTT REED, District Judge.

This action, brought under §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, is currently before the Court on the motion of defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)1 for lack of subject matter jurisdiction, and pursuant to Fed.R.Civ.P. 12(b)6 for failure to state a claim upon which relief can be granted.

The plaintiffs in this action (hereinafter referred to as TTI) are three corporations organized in the late 1970's to transport coal from central Kentucky to the Ohio River, where the coal would be transferred to barges for shipment to domestic and foreign consumers. Defendant L & N is a corporation whose principal business is to operate a railroad in a thirteen-state region between Chicago and the Gulf of Mexico. Defendant C & O is a corporation operating a railroad in the northeast quadrant of the United States. L & N and C & O are wholly-owned subsidiaries of defendant CSX, which also owns the Baltimore & Ohio Railway Company.

According to plaintiffs, the purpose of the TTI project was to open up the inland waterways system as a significant avenue of commerce for Kentucky bituminous steam coal and as an alternative to rail transportation on defendants' lines. Plaintiffs currently own and operate a fifty-mile railroad line which they purchased in abandonment proceedings from defendant L & N in 1979. Plaintiffs claim to have invested several million dollars in improvements to the line. They originally planned to use this line to feed a large rail-to-barge coal transfer facility which they sought to build on land they obtained in Charleston Bottoms, Kentucky.

The success of plaintiffs' scheme apparently hinged on the cooperation of defendants L & N and C & O. Cars carried on the TTI line cannot reach the Ohio River

without crossing C & O lines and property. In order for coal to reach the beginning of the TTI line at Paris, Kentucky, it must be hauled from the mine origins via the L & N. Plaintiffs' plans have been foiled, the complaint alleges, by the illegal acts and obstructive tactics of the defendants, their competitors. Plaintiffs never built the Charleston Bottoms terminal and currently use a smaller, less efficient coal transfer facility at Maysville, Kentucky. Plaintiffs allege that their project is currently losing some half-million dollars per month.

From virtually their first day of operation, plaintiffs have been embroiled in various disputes with defendants, including numerous proceedings before the Interstate Commerce Commission (ICC), the Kentucky Railroad Commission (KRC), and the Kentucky courts. Dissatisfied with the results of those proceedings, plaintiffs filed this action on December 6, 1982, seeking relief under the federal antitrust laws.

In their complaint, plaintiffs allege that defendants, individually and in concert with each other, have sought to maintain, extend, or acquire monopoly power over the transportation of Kentucky coal, in violation of §§ 1 and 2 of the Sherman Antitrust Act. Defendants allegedly violated the Sherman Act by refusing to set rates for some shippers attempting to use the TTI project; by establishing rates and charges designed to discriminate against TTI and to exclude it from the marketplace; by refusing to provide access to TTI's proposed terminal site at Charleston Bottoms; and by instituting sham proceedings before the KRC, ICC and the Kentucky courts designed to harass and impede plaintiffs. Plaintiffs also assert against defendants various state law claims for breach of contract, fraud, harassment, monopoly, and restraint of trade.

Defendants characterize plaintiffs' antitrust claims as an attack on the level of defendants' rates; since rate levels are actively regulated by the ICC and KRC and are within the exclusive jurisdiction of those agencies, defendants argue, the Court must dismiss these claims for lack of subject matter jurisdiction. Defendants also argue that the abuse of process claims must be dismissed because they seek to attack petitioning activity which is immune from antitrust scrutiny under the First Amendment. Finally, defendants assert that, once the federal antitrust claims are dismissed, the claims under state law must likewise be dismissed for lack of pendent jurisdiction.

\* \* \* \* \* \*

## THE RATE–RELATED CLAIMS

Defendants begin by asserting that conduct regulated by an administrative agency under a statutory public interest standard is not subject to the antitrust laws. This sweeping assertion is not supported by the specific holdings of the cases cited by defendants and is contrary to well-accepted principles of statutory construction.

In a long line of cases, commencing with *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), the Supreme Court has repeatedly rejected the notion that regulated industries are exempt from the antitrust laws. *See, e.g., Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1944). The Supreme Court has never held that a regulatory act has completely displaced the antitrust laws in the sweeping manner suggested by defendants. *See Marnell v. United Parcel Service*, 260 F.Supp. 391, 400 (N.D.Calif. 1966) and cases cited therein.

To determine whether conduct subject to administrative regulation is thereby exempt from the antitrust laws, courts must refer to the intent of Congress. Congress has exempted certain transactions and activities by carriers from scrutiny under the antitrust laws. *See, e.g.,* 49 U.S.C. §§ 10706 and 11343. Such express exemptions are strictly and narrowly construed. *Federal Maritime Commission v. Seatrain Lines*, 411 U.S. 726, 733, 93 S.Ct. 1773, 1778, 36 L.Ed.2d 620 (1973). Defendants do not assert that any of these express exemptions are applicable to the conduct at issue herein. Instead,

their position is that such immunity must be implied from the all-encompassing nature of the regulatory scheme.

■■■ Repeals by implication are disfavored in the law. Because of the "fundamental national policies embodied in the antitrust laws," *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973), courts hesitate to find that Congress implicitly repealed those laws simply by adopting a regulatory scheme. *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 350, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963). Immunity will not be found merely because Congress gave the administrative agency jurisdiction to regulate the conduct in question. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596–97 n. 36, 96 S.Ct. 3110, 3120–21 n. 36 (1976); *Gordon v. New York Stock Exchange*, 422 U.S. 659, 692, 95 S.Ct. 2598, 2616, 45 L.Ed.2d 463 (1975) (Stewart, J., concurring). Nor will immunity be implied because the public interest standard requires or permits the agency to weigh antitrust considerations. *Otter Tail Power Co. v. United States, supra*, 410 U.S. at 373–74, 93 S.Ct. 1027–28.

■■■ The test for finding an implicit repeal of the antitrust laws is strict and is seldom satisfied. The Supreme Court has consistently held that implicit repeal will be found only where there is a "clear repugnancy" between the antitrust and regulatory regimes, and, even then, only to the minimum extent necessary to give meaning to the regulatory act passed by Congress. *Cantor v. Detroit Edison Co., supra; Gordon v. New York Stock Exchange, supra; Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The courts have repeatedly rejected the notion that extensive regulation by itself is sufficient to confer antitrust immunity where the challenged conduct is voluntarily initiated. *Otter Tail Power Co. v. United States*, 410 U.S. at 374, 93 S.Ct. at 1028; *M.C.I. Communications Corp. v. A.T. & T. Co.*, 1982–83 Trade Cases [CCH] ¶ 65,137, 71,365, 708 F.2d 1081 (7th Cir. 1983).

Citing *Hughes Tool, Inc. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), and *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), cases relied upon by defendants, the Supreme Court has emphasized that such immunity is the exception rather than the rule:

> We have implied immunity in *particular and discrete* instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws. *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 734–35 [95 S.Ct. 2427, 2450, 45 L.Ed.2d 486] (1975). (Emphasis added.)

It is clear that allowing this antitrust case to proceed would pose no danger of disrupting the scheme of regulation in the public interest carried out by the ICC and KRC.

■■■ As a general matter, the cases show that the antitrust laws and the Interstate Commerce Act are certainly not repugnant to one another but are mutually compatible in their objectives. This is particularly the case since the passage of the Staggers Rail Act of 1980, which seeks to free rail carriers from regulatory restraint and to open up the industry to a greater degree of marketplace competition. *See, e.g., Cleveland-Cliffs Iron Co. v. I.C.C.*, 664 F.2d 568, 588 (6th Cir.1981); *Hanna Mining Co. v. Escanaba and Lake Superior R. Co.*, 664 F.2d 594, 597–99 (6th Cir. 1981). In the preamble to that act, Congress declared it to be national policy "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101a(1). The act further states that its provisions shall not be construed to make lawful "a competitive practice that is unfair, destructive, predatory, or otherwise undermines competition that is necessary in the public inter-

est..." 49 U.S.C. § 10711(2). One of its express goals is "to prohibit predatory pricing and practices, to avoid undue concentration of market power and to prohibit unlawful discrimination." 49 U.S.C. § 10101a(13). Among other changes intended to substitute marketplace forces for regulation, the Staggers Act stripped the ICC (and, correspondingly, the KRC) of all jurisdiction to review railroad rates and charges except in limited circumstances where they are above or below certain jurisdictional thresholds. *See* 49 U.S.C. §§ 10701a and 10709. In passing this law, Congress intended that railroads and other carriers would continue to be subject to the antitrust laws. *See* Cong.Rec. H5904–05 (June 30, 1980).

Pervasive regulation of railroad rates and charges is a relic of the past. The courts have consistently held, and the legislative history of the Staggers Rail Act of 1980 reiterated, that the objectives of the Interstate Commerce Act and the federal antitrust laws are compatible, not in conflict. *See, e.g., Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 692–93 (9th Cir.1977).

■ Furthermore, there is no conflict between the antitrust and regulatory regimes in the specific circumstances of this case. As suggested by defendants, the Court in ruling on this motion may look to the various agency orders and decisions relevant to this controversy. *See, e.g., Marnell v. United Parcel Service*, 260 F.Supp. at 398. Defendants have filed copies of many such decisions as part of the record, and, in their memorandum, have summarized the history of the ICC and KRC proceedings involving the parties. Plaintiffs, in Exhibit C appended to their motion in opposition to dismissal, take issue with minor details of defendants' summary, but do not dispute it in any significant particular.

■ A review of these documents reveals that neither the ICC nor the KRC has specifically approved the rate-related conduct alleged herein to constitute a violation of the Sherman Act. First, in most, if not all, of the particulars at issue herein, the regulatory agency never mandated or approved the conduct in question. In many cases, the agency found that the rate initially set by defendants was too high, thereby implicitly disapproving of defendants' actions. In at least two cases, the ICC allowed proposed rates to become effective without a finding that it even had jurisdiction to review the rates at issue. Finally, much of the conduct alleged in the complaint was never the subject of any regulatory proceeding. This is not a situation where the ICC or KRC specifically approved the very conduct alleged to constitute an antitrust violation. *Cf. Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The Court will now briefly summarize the regulatory actions relevant to the allegations of the complaint.

In paragraph 26 of the complaint, plaintiffs allege that defendant L & N at first refused to establish intrastate rail rates for shipment of coal from mine origins to Paris, Kentucky, where the TTI line begins. Defendants do not assert that any regulatory body approved or endorsed L & N's alleged initial refusal to set a rate which would allow intrastate shippers to use TTI's services.

TTI adopted as its own L & N's pre-existing through rates for shipments from mine origins to destinations along the TTI line, but, according to plaintiffs, L & N refused to negotiate a reasonable division of those rates with plaintiffs. Plaintiffs then petitioned the KRC to prescribe a division of those joint rates. The KRC, in that proceeding, found that the percentages of revenue requested by plaintiff were "just, reasonable and fair to both itself and defendant L & N." The KRC further found that the divisions requested by plaintiff, but apparently refused by L & N, were

*less than those which the L & N actually received* pursuant to division agree-

ments in effect when L & N owned and provided service on the railroad line now owned and operated by TTI. Furthermore, the proposed divisions to TTI are less than that which had previously been received by the Frankfort and Cincinnati Railroad when it was a full participating short-line railroad interchanging with the L & N at Paris, Kentucky (the same point as the interchange between TTI and L & N). (Defendants' exhibits at 107–08) (Emphasis added.)

Although the KRC did not explicitly condemn L & N's conduct in negotiating with plaintiffs and in refusing plaintiffs' requests, it certainly did not approve it.

In paragraph 28 of the complaint, plaintiffs allege that defendants at first refused to establish a joint or proportional *inter*state rail rate for shipment of coal from mine origins to Paris. Defendants do not appear to maintain that any regulatory agency endorsed this initial refusal to set a proportional rate to Paris or a division of the joint rates then in effect.

On June 15, 1982, defendant L & N established rates for shipment of coal to TTI at Paris. Plaintiffs allege that these rates are prohibitively high and were set to preclude the use of TTI's services in interstate coal traffic. (Complaint, ¶ 28.) On June 25, 1982, the ICC summarily denied plaintiffs' request to suspend and investigate these rates. (Defendants' exhibits at 107–08.) The effect of this decision was to allow the proposed rates to become effective. However, in its three-paragraph opinion, the ICC nowhere states that it found these rates to be reasonable or even that it had jurisdiction to determine reasonableness.

Plaintiffs also allege that when L & N established the prohibitive rate to Paris, Kentucky, it simultaneously lowered its rates to barge terminals on the Ohio River which it served directly and which were in competition with plaintiffs' Maysville terminal. According to plaintiffs, defendant L & N's purposes were to make it uneconomical for shippers to use the TTI project and to drive TTI out of business. (Complaint,

¶ 28.) At pages 32–34 of their memorandum, defendants describe various proceedings involving *increases* in rail rates to those competing terminals, but those rate changes are not at issue in this case. Defendants admit in their brief that the rate *decreases* complained of by plaintiffs have never been the subject of any regulatory proceedings.

At the same time that defendant L & N established prohibitive interstate rates to Paris, plaintiffs allege, the C & O raised (from $7.00 to $70.00 per car) its fees for switching cars from TTI's rail line across the C & O property to TTI's temporary terminal at Maysville. Plaintiffs allege that the proposed switching charges were prohibitively high and were part of a conspiracy between L & N and C & O to preclude the use of the TTI project by prospective shippers. (Complaint, ¶ 29.) In response to plaintiffs' protests, on July 1, 1982, the KRC held that the proposed switching fee would be excessive, instituted an investigation, and suspended the increase as to intrastate traffic pending investigation. (Defendants' exhibits at 493–95.) On October 12, 1982, the KRC prescribed a maximum switching charge of $35 per car for coal traffic and $55 per car on non-coal traffic. (Defendants' exhibits at 598.) Clearly, defendants cannot credibly contend that the KRC approved the increase in switching charges originally sought by defendant C & O.

TTI also protested C & O's proposed increase in the switching charges applicable to *inter*state traffic. Defendant C & O opposed plaintiffs' request that the ICC suspend and investigate the proposed charges, strenuously objecting that the ICC had no jurisdiction to review the charges in question. (Defendants' exhibits at 666.) On July 16, 1982, in a four-paragraph decision, the ICC denied plaintiffs' request and allowed the proposed charges to become effective. (Defendants' exhibits at 698.) Again, in its decision, the ICC nowhere expressly stated that it found the charges to be reasonable or even that it had jurisdiction to determine reasonableness.

In paragraph 30 of the complaint, plaintiffs allege that the C & O refused to establish multicar or train load rail rates to TTI's terminal for coal destined for export. According to plaintiffs, the C & O established only a prohibitive single-car rate for export coal, thereby abusing its monopoly over the transportation of coal from the Big Sandy Reserve District. Defendants do not allege that either regulatory body has endorsed the C & O's refusal to establish multicar or train load rail rates to the TTI terminal.

Plaintiffs further allege that defendant C & O refused to establish multicar or train load rail rates to TTI's terminal for coal destined for *domestic* consumption except on the condition that TTI acquiesce to the prohibitive single car rate on export coal. (Complaint, ¶ 30.) Again, defendants do not allege that either regulatory body has approved the C & O's alleged refusal to establish multicar or train load rail rates to the TTI terminal. Apparently, defendant C & O's rail rates to the TTI terminal have not been the subject of any regulatory proceeding involving the parties in this case.

In summary, the regulatory actions described above do not constitute approval or endorsement of the rates and charges initially set by defendants. At best, the regulatory agencies merely acquiesced in the pricing decisions made by defendants; the ICC and KRC by no means found that the rates in question were compelled by or even were consistent with the Interstate Commerce Act. In fact, it is likely that, as contended by defendants in ICC proceedings, the ICC and KRC lack jurisdiction to review these rates and charges because they do not exceed the jurisdictional thresholds set forth in 49 U.S.C. §§ 10701a and 10709. There is, therefore, no danger that refusal to grant immunity would subject defendants to antitrust liability for conduct expressly approved by a regulatory agency. *Cf. Hughes Tool Co. v. Trans World Airlines, Inc., supra; Pan American World Airways, Inc. v. United States, supra.*

Second, and more important, the regulatory and antitrust regimes are not in conflict in this case because this action is not a challenge to the *level* of defendants' rates and charges, as defendants contend. Defendants misconstrue the very nature of plaintiffs' complaint in an effort to place its allegations squarely within the exclusive jurisdiction of the ICC and KRC. Plaintiffs do not ask the Court simply to find specific rates to be unreasonably high and to lower them retroactively to reasonable levels. *Cf. Keogh v. Chicago & Northwestern Ry. Co., supra.* Instead, plaintiffs seek to establish that defendants engaged in a broad pattern of conduct, including but not limited to the manipulation of rates, specifically designed to destroy the TTI project as a competitor. Damages would be measured not by the difference between the existing rates and some hypothetical rate, but by the business losses plaintiffs have sustained. Plaintiffs' complaint does not put in issue the lawfulness of defendants' rates and charges under the Interstate Commerce Act.

These claims under the Sherman Act do not fall within the jurisdiction, exclusive or otherwise, of the ICC and KRC. Although the ICC does consider antitrust principles in determining the reasonableness of rates, the agency lacks authority to enforce the antitrust laws or even to determine if they have been violated. *See, e.g., McLean Trucking Co. v. United States,* 321 U.S. 67, 79, 64 S.Ct. 370, 376, 88 L.Ed. 544 (1944); *Central Yellow Pine Ass'n. v. Illinois Central R.R. Co.,* 10 I.C.C. 505, 541 (1905); *Sprigg v. Baltimore & Ohio R.R. Co.,* 8 I.C.C. 443, 456 (1900); *Union Pacific—Control—Missouri Pacific; Western Pacific,* 366 I.C.C. 462, 485 (1982).

Arguably, the ICC and KRC, in some cases by their inaction, authorized defendants to impose some of the rates at issue herein. However, courts have repeatedly held that

the mere fact of such authorization of rates or contracts or other conduct by a regulatory agency does not obviate the possibility that such rates, contracts or

conduct, although authorized for one purpose, may be used for another unlawful purpose. *Marnell v. United Parcel Service of America, Inc.*, 260 F.Supp. at 403.

Furthermore, even an express determination that the rates initially set by defendants were reasonable would not foreclose plaintiffs' claims of conspiracy in restraint of trade and illegal attempts to monopolize. *See United States v. Baltimore & Ohio R.R. Co.*, 538 F.Supp. 200, 207 (D.D.C. 1982). Plaintiffs' rate-related claims are not within the exclusive jurisdiction of the ICC and KRC; defendants' suggestion that the Court lacks subject matter jurisdiction over these claims is without merit.

 Next, defendants argue that § 16 of the Clayton Act, 15 U.S.C. § 26, precludes the award of injunctive relief to plaintiffs. Section 16 of the Clayton Act, which authorizes private parties to seek injunctive relief against threatened violations of the antitrust laws, contains the following proviso:

> [N]othing contained herein shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.

Defendants interpret this proviso to bar injunctive relief touching on any matter subject to ICC regulation. (Defendants' reply brief, at p. 13.) Again, the cases cited do not establish such a broad exception to the antitrust jurisdiction of the federal courts.

Almost forty years ago, in *Georgia v. Pennsylvania R.R. Co., supra,* the Supreme Court laid to rest the notion that § 16 of the Clayton Act barred all forms of injunctive relief against regulated carriers. In *Georgia,* the Court held that § 16 did not preclude injunctive relief against certain collective rate-making activity.

> The relief which Georgia seeks is not a matter subject to the jurisdiction of the Commission. Georgia in this proceeding is not seeking an injunction against the continuance of any tariff; nor does she seek to have any tariff provision cancelled. She merely asks that the alleged rate-fixing combination and conspiracy among the defendant-carriers be enjoined. As we shall see, that is a matter over which the Commission has no jurisdiction. And an injunction designed to put an end to the conspiracy need not enjoin operations under established rates as would have been the case had an injunction issued in *Central Transfer Co. v. Terminal R. Ass'n., supra,* 324 U.S. at 455, 65 S.Ct. at 725.

In the complaint, plaintiffs request an injunction against further acts by defendants "which are intended to eliminate or have the effect of eliminating the TTI project as a competitor." (Complaint, ¶ I.) Plaintiffs have not yet formulated the exact terms of the injunction they seek. Although it appears that an injunction altering the particular rates and charges imposed by defendants would offend § 16 of the Clayton Act, the Court is not prepared to hold at this time that such a provision would be a necessary part of any injunction granted in this case. Construing the complaint most favorably to plaintiffs, it is not clear that the injunction requested would "enjoin operations under established rates," *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. at 455, 65 S.Ct. at 725. At this stage of the proceedings, defendants' motion to dismiss must be denied in this particular.

\* \* \* \* \* \*

## SHAM LITIGATION CLAIMS

Next, defendants argue that the allegations of abuse of regulatory and judicial procedures fail to state a claim within the jurisdiction of this Court because the conduct alleged is protected under the First Amendment to the United States Constitution, as established in a trio of Supreme Court decisions. *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d

626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In *Noerr, supra,* the Court held that Sherman Act liability could not be predicated on mere attempts to influence the passage or enforcement of laws by the legislature or executive, even if that attempt had only an anticompetitive purpose. *Id.* 365 U.S. at 135–40, 81 S.Ct. at 528–31. However, the *Noerr* Court also recognized that a sham attempt to influence governmental action would not be immune.

> there may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Id.* at 144, 81 S.Ct. at 533.

In *California Motor Transport, supra,* the Court extended the *Noerr* immunity to administrative and judicial proceedings and, for the first time, applied the "sham litigation" exception. In that case, plaintiffs alleged that a group of trucking company defendants carried out a plan to oppose before regulatory agencies and reviewing courts all applications for operating rights filed by competing carriers, regardless of merit. Plaintiffs further alleged that defendants filed these repetitive and baseless claims solely for purposes of harassment and elimination of competition. While recognizing that the First Amendment's right of petition protects the defendants' access to the agencies and courts to oppose the grant of operating rights, the Court held that these allegations properly stated a claim within the sham exception to the *Noerr* immunity.

Plaintiffs in the instant action maintain that their claims of abuse of regulatory and judicial processes are not subject to dismissal because these allegations likewise fall squarely within the sham exception to the *Noerr* doctrine. As in *California Motor Transport,* plaintiffs herein allege that defendants pursued a course of baseless litigation intended solely to destroy plaintiffs as competitors.

In paragraph 26 of the complaint, plaintiffs allege that defendant L & N attempted to obstruct and subvert the KRC proceeding in which plaintiffs sought and ultimately obtained a division of the joint rates described above. In this proceeding, the L & N knowingly presented false and misleading evidence of its costs to the KRC, plaintiffs allege. The L & N prosecuted a frivolous appeal from the KRC order, according to plaintiffs, in which it obtained a temporary restraining order which was subsequently found to be without merit and dissolved; the L & N then renewed its motion for a temporary restraining order without success. Plaintiffs also accuse the L & N of presenting false and misleading evidence to the Kentucky appellate court reviewing the KRC order. The L & N then filed a petition for reconsideration with the KRC which plaintiffs characterize as frivolous. Finally, plaintiffs allege that the L & N initiated a sham proceeding before the ICC claiming that the KRC lacked jurisdiction over the rates in question.

Paragraph 27 of the complaint accuses the L & N of conducting another set of sham proceedings intended to destroy the TTI project. After sale of the Maysville-Paris line to TTI, defendant L & N unsuccessfully petitioned the ICC to reopen the abandonment proceedings and to have TTI declared an unfit purchaser. The L & N also contested TTI's request to the ICC to extend the emergency car service order which gave TTI authority to operate. Finally, the L & N protested issuance by the ICC of a certificate of public convenience and necessity to plaintiff railroad. Plaintiffs allege that the L & N took these actions solely for the purpose of eliminating TTI as a competitor and without even an arguable legitimate interest to protect.

█ The question before the Court is whether these allegations are sufficient to avoid dismissal under the *Noerr* doctrine for failure to state a claim upon which relief may be granted. The Court must, of course, take the allegations of the com-

plaint as admitted for purposes of this motion. *Walker Process Equipment v. Food Machinery Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965).

Although the *California Motor Transport* Court did not undertake to delineate the precise boundaries of the sham exception, it did list examples of activity falling outside the protection of the *Noerr* immunity. One type of activity *not* immunized is the use of fraud or misrepresentations in adjudicatory proceedings. In describing the limits of First Amendment protection, the *California Motor Transport* Court stated:

> Yet unethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in *Walker Process Equipment v. Food Machinery & Chemical Corp.*, (citation omitted) ... There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. *Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.* (Emphasis supplied.)

404 U.S. at 512–13, 92 S.Ct. at 612–13.

Even if the filing and prosecution of the claims at issue herein are protected from antitrust scrutiny by the First Amendment, the commission of fraud and the knowing submission of false information do not enjoy immunity under the *Noerr* doctrine. *California Motor Transport Co. v. Trucking Unlimited, supra,* at 512–13, 92 S.Ct. at 612–13; *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n.*, 663 F.2d 253, 263 (D.C. Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472. Plaintiffs have properly alleged that defendants "subverted the integrity of the governmental process," *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n., supra,* at 262–63; therefore, this aspect of

the complaint is not subject to dismissal at this time under Fed.R.Civ.P. 12(b)1 or 12(b)6.

Next, defendants maintain that antitrust liability cannot result from the mere filing and prosecution of the claims in question. Defendants' first objection is that the complaint fails to allege that the actions of defendants effectively barred plaintiffs' access to the agencies and courts. Defendants' position apparently is that *California Motor Transport* established that such an allegation is essential in order to overcome the immunity provided under the First Amendment.

As plaintiffs properly point out, they need not allege deprivation of access in order to make out a claim of abuse of regulatory and judicial processes.

> The Court [in *California Motor Transport v. Trucking Unlimited* ], in holding that a cause of action was stated under the sham exception, based its decision on alternative grounds—access barring and also the fact that the administrative and judicial process had been abused. *Id.* [404 U.S.] at 513, 92 S.Ct. at 613. In *Trucking Unlimited,* the concepts of access barring and abuse of judicial process were treated interchangeably because the defendants' intervention in the administrative process in that case involved both. Subsequent decisions of the Supreme Court indicate that the access-barring language of *Trucking Unlimited* referred only to the particular circumstances in that case, and did not establish access barring as a prerequisite to a sham exception suit.

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,* 690 F.2d 1240, 1257 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

This aspect of the complaint is not subject to dismissal merely because plaintiffs failed to allege that their access to judicial and administrative tribunals was effectively barred by the actions of defendants. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., supra; Ernest W.*

*Hahn, Inc. v. Codding,* 615 F.2d 830 (9th Cir.1980).

 Defendants' second objection to the abuse of process claim is that it contains conclusory allegations which are not specific enough to overcome a motion to dismiss for failure to state a claim. Citing *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board,* 542 F.2d 1076 (9th Cir.1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1976), defendants argue that, because the mere pendency of lawsuits challenging activities immune under the *Noerr* doctrine from antitrust scrutiny may chill the exercise of First Amendment rights, plaintiffs should not be able to avoid early dismissal simply by reciting the conclusory language of the sham exception.

In *Franchise Realty,* plaintiffs, subsidiaries of the McDonald's restaurant chain, brought suit against a restaurant employer organization and a labor union after the latter successfully opposed plaintiffs' applications for restaurant permits before the San Francisco Board of Permit Appeals. Defendants' reliance on this case is misplaced for a number of reasons. First, in *Franchise Realty,* the defendants prevailed in the action labeled a sham by plaintiffs, while in the instant action defendants were ultimately unsuccessful in each of the actions identified in paragraphs 26 and 27 of the complaint. Although it may be difficult to prove that a complaint was a sham where the party seeking relief actually prevails, *see, e.g., Mid-Texas Communications Systems, Inc. v. Amer. Tel. & Tel. Co.,* 615 F.2d 1372, 1383 (5th Cir.1980), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140; *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.,* 560 F.2d 211, 213 (6th Cir.1977) *(per curiam ),* termination of the litigation in favor of the antitrust plaintiff is at least strong evidence of the allegedly baseless nature of the challenged lawsuit. *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 841 & n. 13 (9th Cir.1980). Although defendants cite plaintiffs' successes before the ICC, KRC, and Kentucky courts as supporting dismissal, in fact, this evidence tends to support plaintiffs' allegations that the litigation was a sham.

Second, the tribunal in *Franchise Realty* was, according to the Court, "as much a political body as an adjudicatory body," 452 F.2d at 1079, while in this case the proceedings before the ICC, KRC, and the Kentucky courts were adjudicatory in nature. Dismissal is more readily granted where the alleged sham activity occurs before a non-adjudicatory body because the grant of immunity is more broadly construed in political settings. *See Ernest W. Hahn, Inc. v. Codding, supra,* at 842. As the *California Motor Transport* Court noted, misrepresentations and other questionable conduct which are not condoned in adjudicatory settings may be immunized when used in the political arena. 404 U.S. at 513, 92 S.Ct. at 613. *Franchise Realty* explained the difficulties inherent in characterizing political activity as "sham" or "baseless":

> The relatively precise legal standards in light of which certain arguments may be characterized as "frivolous" are simply absent from the rough and tumble of the political arena; almost any position, including the self-interested plea of one competitor that another should be denied a permit, may be urged before such a political body.

542 F.2d at 1079.

In light of these factors, not present in the instant action, the *Franchise Realty* court found it possible to conclude that plaintiffs' "sham" allegations were themselves frivolous and, therefore, dismissed the action for failure to state a claim. However, in this case, the Court is not prepared to hold that it now appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1955). Therefore, defendants' motion must be denied.

\*　　\*　　\*　　\*　　\*　　\*

 Defendants' reliance on Section 214 of the Staggers Act, 49 U.S.C. § 10501(d), is likewise misplaced. Section 214 provides:

The jurisdiction of the Commission and of State authorities ... over transportation by rail carriers, and the remedies provided in this title with respect to rates, classifications, rules, and practices of such carriers, is exclusive.

Since plaintiffs are not requesting a remedy provided under Title 49, this provision is not applicable.

■ Since this action does not call for the resolution of any "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," *United States v. Western Pacific R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), defendants' alternative motion to refer this case to the ICC under the doctrine of primary jurisdiction is likewise denied.

Since the motion to dismiss the claims under federal law is denied, the motion to dismiss the state law claims for lack of pendent jurisdiction must also be denied.

IT IS NOW THEREFORE ORDERED AND ADJUDGED that the motion of defendants to dismiss the complaint or, in the alternative, to refer the case to the Interstate Commerce Commission under the doctrine of primary jurisdiction, should be, and hereby is, DENIED.