**Robert HANSEN, d/b/a Hansen Trucking, Plaintiff-Appellant,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, et al., Defendants-Appellees.**

No. 81–3004.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1982.

Decided Sept. 24, 1982.

Gregory A. Young, Watson & Rochford, Indianapolis, Ind., for plaintiff-appellant.

John L. Ropiequet, Arnstein, Gluck & Lehr, Chicago, Ill., James V. McGlone, Stewart, Branigin, Ricks & Schilling, LaFayette, Ind., for defendants-appellees.

Before BAUER and ESCHBACH, Circuit Judges, and JAMESON,* Senior District Judge.

ESCHBACH, Circuit Judge.

The plaintiff in this action appeals from the district court's dismissal, without prejudice, of his complaint that alleges various violations of the Revised Interstate Commerce Act, 49 U.S.C. §§ 10101–11916, and

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, sitting by designation.

the antitrust laws. We are asked to decide whether the district court erred: (1) in determining that the Interstate Commerce Commission (ICC) has primary jurisdiction over this case, and (2) in dismissing, rather than staying, the plaintiff's action. Noting jurisdiction under 28 U.S.C. § 1291, we affirm the district court's determination that the ICC has primary jurisdiction, but we reverse the dismissal of the complaint and remand the case with instructions to stay the action pending proceedings by the ICC.

## I. THE COMPLAINT

Plaintiff Hansen Trucking, which does business in Illinois and Indiana, is a motor carrier of general freight commodities. The complaint names as defendants: the Norfolk and Western Railway Company (N & W), which transports freight by rail throughout numerous states, including Illinois and Indiana; ten other rail carriers (referred to collectively as the "Railway Companies"); National Piggyback Services (NPS), whose business is not identified; Piggyback Transportation Services (PTS), a motor carrier allegedly formed by N & W and NPS for the sole purpose of providing motor carrier service to N & W and NPS; and thirteen firms (identified collectively as "Shippers"), which allegedly utilize the common carrier services of N & W or PTS.

The plaintiff, in Count I of the complaint, alleges that N & W has violated the tariff requirements of 49 U.S.C. § 10761(a).[1] In particular, the plaintiff charges N & W with offering improper rebates, preferences, and kickbacks to its customers and accuses NPS, PTS, the Railway Companies, and the Shippers, of conspiring with N & W to circumvent the applicable tariffs.

Count I also contains the allegation that PTS "provided substituted service for Defendant N & W without any tariff provi-

sions or authorities . . . which is contrary to and prohibited by the Revised Interstate Commerce Act, 49 U.S.C. § 10761(a)." The term "substituted service" refers to the use of "piggyback" motor freight trailers that can be loaded onto railway flatcars. *See generally American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway Co.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).

The plaintiff, in Count II, alleges that the defendants have violated sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section two of the Clayton Act, 15 U.S.C. § 13, by conspiring "to fix and control the common carrier services between various points of origin of shipment, to intermediate points of rail carriers' and to ultimate points of destination." The plaintiff also contends that in furtherance of this conspiracy, "Defendants N & W and NP[S] created Defendant PTS . . . for the single and sole purpose of providing motor carrier service for said Defendants in violation of the Revised Interstate Commerce Act, 49 U.S.C. § 10101 et seq., and the Interstate Commerce Commission's tariffs, regulations and rates." The formation and operation of PTS, the plaintiff alleges, "has effectively precluded [plaintiff] from competing fairly and openly with Defendant PTS except on the terms and conditions as controlled by Defendants N & W, NP[S] and PTS, all of which is in violation of the [Sherman and Clayton Acts]."

## II. PRIMARY JURISDICTION

■ A. The plaintiff contends that it has an unqualified right to select the forum that will initially hear its claim that the defendants have violated provisions of the Revised Interstate Commerce Act. This assertion is based on the language of 49 U.S.C. § 11705(c)(1), which provides in pertinent part:

> under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

---

1. Section 10761(a) states:

   *Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect*

A person may file a complaint with the Commission under section 11701(b) of this title or bring a civil action under subsection (b)(1) or (2) of this section to enforce liability against a common carrier providing transportation subject to the jurisdiction of the Commission . . . .

The plaintiff's contention ignores the history of § 11705(c)(1) and is inconsistent with the cases that have construed the language of this provision. Section 11705(c)(1) was enacted in 1978, Pub. L. No. 95–473, 92 Stat. 1467, and is essentially a recodification of § 9 of the original Interstate Commerce Act of 1887, 24 Stat. 382, 49 U.S.C. § 9 (1976) (repealed 1978). Current § 11705(c)(1) and former § 9 are identical in all relevant aspects,[2] and as early as 1907, the Supreme Court held that the doctrine of primary jurisdiction was applicable to actions brought pursuant to former § 9, *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). In *Interstate Commerce Commission v. Atlantic Coastline Ry. Co.,* 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966), the Supreme Court, expounding upon the relationship between former § 9 and the primary jurisdiction doctrine, stated:

> By § 9, the complainant is given the alternatives of seeking such damages by complaint to the Commission, . . . or of bringing suit in a federal district court. But the primary jurisdiction doctrine requires initial submission to the Commission of questions that raise "issues of transportation policy which ought to be considered by the Commission . . . ."

*Id.* at 579, 86 S.Ct. at 1004 (quoting *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 65, 77 S.Ct. 161, 165–166, 1 L.Ed.2d 126 (1965)). In light of this precedent and the fact that the 1978 revisions to the Inter-

state Commerce Act were primarily designed "to eliminate awkward and obsolete terms," *Transway Corp. v. Hawaiian Express Service, Inc.,* 679 F.2d 1328, 1330 n. 4 (9th Cir. 1982), we are convinced that the doctrine of primary jurisdiction remains viable in the context of claims brought pursuant to § 11705(c)(1). *See generally Cannon v. University of Chicago,* 441 U.S. 667, 696–98, 99 S.Ct. 1946, 1957–1958, 60 L.Ed.2d 560 (1979) (it is appropriate to assume that Congress knows the judicial interpretations of statutes).

■  B.  The doctrine of primary jurisdiction is a reflection of the fact that when a court is confronted with a claim as to which it shares concurrent jurisdiction with an administrative agency, there may be sound reasons for the court to stay its hand until the agency has applied its expertise to the salient questions. The doctrine comes into play when a claim is cognizable in a court but adjudication of the claim "requires the resolution of issues which, under a regulatory scheme have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

■  No fixed formula exists for applying the doctrine of primary jurisdiction, but "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). If a specialized agency, in the first instance, answers questions of tariff applications and construc-

---

**2.** Former § 9 provided in pertinent part:

Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable

under the provisions of this chapter in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt.

49 U.S.C. § 9 (1976) (repealed 1978).

tions, uniform and consistent regulation may be secured. *See id.; Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

■ Applying these principles, we believe that the plaintiff's complaint reveals ample grounds for invoking the doctrine of primary jurisdiction. Central to Count I of the complaint is the allegation that PTS, created by defendants N & W and NPS, provided piggyback motor freight service for N & W without any tariff provisions or authorities. That is, PTS is charged with illegally using motor trailers that can be loaded onto N & W's flatcars.[3] Piggyback service, however, poses difficult transportation policy problems involving the appropriate allocation of services between rail and motor carriers. Because the plaintiff's complaint raises such difficult problems, judicial consideration of this cause must await proceedings by the specialized agency created by Congress to deal with transportation policy—the ICC.

Indeed for many years the ICC has been concerned with the complex policy problems presented by piggyback service. In the 1960's the ICC promulgated a series of rules to govern piggyback service, *see* 49 C.F.R. §§ 500.2 and 500.3 (Supp. 1967), and the Supreme Court in *American Trucking Associations, Inc. v. Atchison, Topeka, and Santa Fe Railway Co.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), sustained the regulations' validity. The Court, recognizing the ICC's broad discretionary authority to regulate piggyback service, stated:

> The controlling fact of the matter is that all piggyback service is, by its essential nature, bimodal. It partakes of both the railroad and the trucking functions. The proper allocation of these bimodal functions involves complex considerations. It is not and cannot be precise or mathematical. Railroads are not now confined to the rails. They operate trucks. They are permitted to assemble cargo and, if they so desire, to use their

own trucks or subsidiary companies to do so. § 202(c), 49 U.S.C. § 302(c). Truckers are not now strictly confined to the highway. In the absence of congressional direction, there is no basis for denying to the ICC the power to allocate and regulate transportation that partakes of both elements . . . .

*Id.* at 420–21, 87 S.Ct. at 1620–1621 (footnote omitted).

In recent years, ICC actions with respect to piggyback service have turned from regulation to deregulation. In 1976, Congress passed the Railroad Revitalization and Regulatory Reform Act, Pub. L. No. 94–210, 90 Stat. 31, in response to the poor financial and competitive conditions of the rail industry. Section 207 of this Act gave the ICC authority to exempt rail services from regulation when, in the ICC's judgment, certain conditions were met. Congress again addressed the economic and competitive condition of the rail industry when it enacted the Staggers Rail Act of 1980, Pub. L. No. 96–448, 94 Stat. 1895. The exemption authority that the ICC had been granted in 1976 was altered by § 213 of the Staggers Act. This revised authority is currently codified at 49 U.S.C. § 10505, and states in pertinent part:

> (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

> > (1) is not necessary to carry out the transportation policy of section 10101a of this title; and

> > (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

> *   *   *   *   *   *

---

3. The plaintiff has admitted that "the issues of this case center on the tariffs and services surrounding Trailer On Flat Car service offered

by defendant rail carriers." Memorandum of Plaintiff's in Response to Defendants' Motions to Dismiss, Record at 495.

(f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as a part of a continuous intermodal movement.

Acting pursuant to the authority granted under § 10505, the ICC recently has issued an order exempting from regulation *rail* and *truck* transportation provided by *rail carriers* in connection with piggyback service. 46 Fed. Reg. 14348 (1981) (codified at 49 C.F.R. § 1039.13 (1981)).[4] In *American Trucking Associations, Inc. v. Interstate Commerce Commission,* 656 F.2d 1115 (5th Cir. 1981), the court, noting that "section 10505(a) confers broad discretionary power on the Commission," *id.* at 1127, sustained the validity of the deregulation order, *id.* at 1122.

Congress has given the ICC, not the courts, broad discretionary authority to regulate or deregulate piggyback services, and the Commission has validly exercised its power. Count I of the plaintiff's complaint, therefore, asks the court to decide issues that are at the heart of the Commission's authority. In the interest of uniformity, the ICC should decide if PTS's piggyback service has been deregulated by the ICC order codified at 49 C.F.R. § 1039.13.[5] If the ICC concludes that PTS's piggyback service is still subject to regulation, the ICC possesses the expertise and the authority to allocate piggyback service between rail and motor freight carriers in the plaintiff's territory. Rather than asking the district court only to resolve a simple dispute over carriage rates, the plaintiff tacitly invited the court to render, without the benefit of

ICC guidance, a decision that may have disrupted the operation of a comprehensive national transportation policy. The able district judge quite properly declined the invitation; the allegations concerning piggyback service must be heard initially by the ICC.

Other issues raised by the plaintiff's complaint are also within the special competence of the ICC to resolve. Because we have concluded that the allegations with respect to piggyback service are within the primary jurisdiction of the ICC, considerations of judicial economy and orderly procedure mandate that the plaintiff present to the ICC all issues in the case as to which the ICC is entitled to assume jurisdiction.[6]

Count I, for instance, contains the allegation that the defendants employed means such as rebates and kickbacks in order to circumvent their published tariffs. The tribunal that deals with this allegation, therefore, must determine what tariff authority was required, which, if any, tariffs applied, and how the tariffs should be construed. At this stage of the litigation we cannot ascertain if this is a case in which determining or interpreting the applicable tariffs will present complex issues requiring the expertise of the ICC. *See, e.g., United States v. United States Steel Corp.,* 645 F.2d 1285 (8th Cir. 1981) (ICC has primary jurisdiction to construe technical term contained in lake cargo coal tariff). We need only note that "one of the purposes of the Interstate Commerce Act is to provide an effective means to redress unjust discrimination through the publication of rates and their undeviating application subject to re-

---

4. The ICC regulation states in pertinent part:
   Railroad and truck transportation provided by a rail carrier as part of a continuous intermodal movement is exempt from the provisions of Subtitle IV of Title 49 with certain exceptions. Carriers must continue to comply with Commission accounting and reporting requirements. All railroad tariffs, pertaining to the transportation of intermodal freight will no longer apply except to the extent adopted by carrier quotations.
   49 C.F.R. § 1039.13 (1981).

5. The deregulation order is addressed to piggyback services "provided by a rail carrier."

Does the order also deregulate piggyback services provided by a motor carrier that is affiliated with a rail carrier? Is the order intended to have retroactive effect? We, of course, express no opinion on these matters but merely raise the questions to show that ICC proceedings are a necessary predicate to the judicial consideration of the plaintiff's cause.

6. We do not have to reach the question whether the issues not relating to piggyback service, but within the jurisdiction of the ICC, would be in the ICC's primary jurisdiction if they were presented by themselves.

view and approval *by the Commission.*" *Indiana Harbor Belt Railroad Co. v. United States,* 510 F.2d 644, 649 (7th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (emphasis added). Because the administrative apparatus is in place and because the ICC has primary jurisdiction over the piggyback service issue, the plaintiff's tariff deviation claim must be brought before the Commission for preliminary disposition.[7]

Judicial consideration of the plaintiff's antitrust claims, enumerated in Count II, similarly must be postponed until the ICC has acted in this case. The antitrust claims are not refined at this juncture of the litigation but, for the reasons stated below, we believe that initial ICC disposition of all the issues within its jurisdiction will considerably aid the lower court in subsequently entertaining the plaintiff's antitrust claims.

The legal claims in Counts I and II are predicated on many common factual allegations. For instance, the allegation in Count I that N & W has circumvented its published tariffs is also incorporated into the second count. Moreover, N & W and NPS's alleged formation of PTS in order to provide piggyback service, is claimed to have violated not only the Revised Interstate Commerce Act but also the Sherman and Clayton Antitrust Acts. ICC consideration of the allegations and arguments forming the plaintiff's Revised Interstate Commerce Act claims, therefore, may narrow or refine the factual issues relating to the plaintiff's antitrust claims.

Moreover, the allegations in Count II give rise to issues concerning the proper relationship between the Revised Interstate Commerce Act and the antitrust statutes. For instance, the defendant Consolidated Services Company (a shipper) argues that if an action violates the Revised Interstate Commerce Act *and* the antitrust laws, a remedy can be afforded *only* pursuant to

the provisions of the Revised Interstate Commerce Act. Because this case raises issues concerning the interrelatedness of statutory schemes, we believe that an ICC determination whether the Commerce Act has been violated by the formation of PTS, will be of immense aid to the court hearing the plaintiff's antitrust claims.

The Supreme Court was presented with an analogous situation in *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). The plaintiff in that action claimed that the defendant had violated the Sherman Act, the Commodity and Exchange Act, and the rules of the Chicago Mercantile Exchange. The Court, in holding that the antitrust claim should be stayed pending administrative proceedings by the Commodity Exchange Commission, announced a principle that we believe applies to the instant case:

> [W]e simply recognize that Congress has established a specialized agency that would determine either that a . . . rule of the Exchange has been violated or that it has been followed. Either judgment would require determination of facts and the interpretation and application of the Act and Exchange rules. And either determination will be of great help to the antitrust court in arriving at the essential accommodation between the antitrust and the regulatory regimes . . . .

*Id.* at 307, 93 S.Ct. at 583.

Both counts of the plaintiff's complaint, therefore, raise issues within the jurisdiction and special competence of the ICC. Furthermore, a court addressing the plaintiff's antitrust claims will be aided by determinations made by the ICC in the course of administrative proceedings. Hence, we hold that judicial consideration of the plaintiff's entire complaint must await disposition by the ICC of all matters within its jurisdiction.[8]

---

7. It is particularly appropriate for the ICC to consider the plaintiff's tariff deviation claim because the absence of expert resolution of the issue might result in nonuniform applications of the tariff.

8. The defendants offer a number of arguments to support their contention that Counts I and II fail to state a claim on which relief can be granted. These arguments were made below but the district court, in dismissing the complaint without prejudice, rested its decision ex-

## III. STAYING THE DISTRICT COURT PROCEEDINGS

Because the primary jurisdiction doctrine is designed to govern timing of judicial consideration, and not to allocate ultimate powers between courts and agencies, *see* K. Davis, *Administrative Law of the Seventies* 436 (1976), a stay of court proceedings is often more consonant with the doctrine than is a dismissal of a complaint. Dismissal of the complaint may be appropriate when all of the relief that is sought in court can be obtained in an administrative forum or in an easily initiated suit subsequent to the administrative proceedings. *See Far East Conference v. United States,* 342 U.S. 570, 576–77, 72 S.Ct. 492, 495–496, 96 L.Ed. 576 (1952). A stay of the court action pending administrative determinations, however, is in order when there is reason to believe that a party may be prejudiced by a dismissal. *United States v. Michigan National Corp.,* 419 U.S. 1, 5, 95 S.Ct. 10, 12, 42 L.Ed.2d 1 (1974).

The Supreme Court in *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), in holding that a plaintiff's antitrust claim should be stayed pending administrative proceedings and not dismissed, stated that "a treble-damage action for past conduct cannot be easily reinstituted at a later time. Such claims are subject to the Statute of Limitations and are likely to be barred by the time the Commission acts." *Id.* at 223, 86 S.Ct. at 787.[9] We believe that the same reasoning applies to the case currently under consideration. The ICC may not possess the authority to entertain all of the issues relating to the plaintiff's antitrust claims; therefore the plaintiff may wish to seek relief pursuant to the antitrust claims after the Commission's proceedings have concluded. The statute of limitations for these claims, *see* 15 U.S.C. § 15b, however, may run before the administrative process is complete. In view of the potential for prejudice, we hold that the district court should not have dismissed the complaint but rather should have stayed further court proceedings in this case until the ICC has acted.[10]

## IV.

For the reasons expressed in this opinion, we affirm the district court's determination that the ICC has primary jurisdiction over this case; adjudication of this action in the district court must wait until the ICC entertains all issues in the case as to which it is authorized to assume jurisdiction. We reverse, however, the order dismissing the complaint and we remand the case to the district court with instructions to vacate the dismissal and to stay the action.

clusively on primary jurisdiction grounds. In light of our conclusion that the ICC has primary jurisdiction in this case and the probability that the ICC proceedings will dispose of or narrow many issues in both counts of the complaint, we do not now address these arguments. The defendants are free, of course, to raise these contentions in the district court if court proceedings are resumed after the ICC has acted. We note that the defendants have not shown that such a delay in the consideration of these arguments would be prejudicial.

9. Responding to the problem of prejudice, lower federal courts that have invoked the primary jurisdiction doctrine in antitrust cases have often stayed the court proceedings. *See, e.g., Johnson v. Combs,* 471 F.2d 84 (5th Cir. 1972), *cert. denied,* 413 U.S. 922, 93 S.Ct. 3063, 37 L.Ed.2d 1044 (1973); *Hapag-Lloyd v. Levine,* 473 F.Supp. 991 (N.D. Ill. 1979).

10. Defendants ask us to affirm the dismissal on the ground that plaintiff never raised the alternative of a stay in its filings with the district court. It would indeed have been better practice for plaintiff to have raised the issue below. *See Booth v. American Telephone and Telegraph Co.,* 253 F.2d 57 (7th Cir. 1958). However, the alternative of a stay pending ICC disposition was expressly raised in the brief filed January 12, 1981, in the district court by defendant Consolidated Rail Corporation. Record at 363, 364. Thus, the "stay" alternative was properly presented below, and under the circumstances of this case, plaintiff's failure to address the issue in the district court is not fatal.