**DELAWARE AND HUDSON RAILWAY COMPANY, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**No. 86–CV–810.**

United States District Court, N.D. New York.

March 2, 1987.

---

5. Landes' motion for sanctions pursuant to Fed. R.Civ.P. 11 is denied.

Dewey Ballantine Bushby Palmer & Wood, New York City, and Sanford M. Litvak, of counsel, George H. Kleinberger, Delaware and Hudson Ry. Co., Watervliet,

N.Y., Kinga M. LaChapelle, of counsel, for plaintiff.

McNamee Lochner Titus & Williams, Albany, N.Y., and Scott A. Barbour, of counsel, Pepper Hamilton & Scheetz, Philadelphia, Pa., Laurence Z. Shiekman, Stephen J. Cipolla, Sean P. Wajert, of counsel, for defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

This treble-damage antitrust action is brought pursuant to 15 U.S.C. § 15. The plaintiff, Delaware and Hudson Railway Company ("D & H"), asserts that it has been injured by actions of the defendant, Consolidated Railway Company ("Conrail"), in contravention of Section two of the Sherman Act, 15 U.S.C. § 2, which forbids a person or company to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States." *Id.* Pending before the court is a motion by Conrail to dismiss the complaint pursuant to F.R.C.P. 12(b)(6). Accordingly, all well-pleaded allegations in the complaint are accepted as true and provide the basis for this court's analysis and decision. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

## I. BACKGROUND

D & H is a Delaware corporation which provides rail transportation services throughout the Mid-Atlantic region. Conrail is a Pennsylvania corporation organized pursuant to the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985 (codified as amended at 45 U.S.C. § 741). Conrail was organized by Congress because of the massive collapse of regional railroads in the 1970's. *See Blanchette v. Connecticut Gen. Ins. Corp.,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). It provides rail transportation services to the Northeast and the Midwest.

D & H and Conrail are competitors. Nevertheless, because of the nature of the railroad business they must jointly participate in the use of rail facilities. No railroad is capable of providing service to every shipper location in the United States. In order to provide national service, railroads are required to participate in "through routes," which are business arrangements made between two or more railroads where they agree to move freight in continuous carriage between the origin on one railroad and the final destination on another. Railroads also operate "single line routes". On a single line route, the entire railway from origin to destination belongs exclusively to one railroad. Larger railroads, such as Conrail, own many single line routes. The smaller railroads, such as D & H, often must interconnect with the larger railroads by the use of through routes to provide service to major metropolitan areas.

Through routes and single line routes may serve the same corridor.[1] Conrail owns a single line route between Chicago and Albany, while Conrail and D & H participate in a through route between those two cities. The through route consists of carriage on Conrail lines between Chicago and Buffalo, and carriage on D & H lines between Buffalo and Albany. There may also be more than one through route servicing the same corridor. Where two or more routes serve the same corridor, they are in direct competition for shippers' business in the corridor.

An important factor in competition is the price, or rate, charged to the shipper. There are three basic rates of concern in this action. A "single line rate" is the rate charged by the operator of a single line route. A "combination rate" is the aggregate of two or more rates on a through route. For example, on the Chicago-Albany through route described above, the combination rate could be the sum of the Conrail Chicago-Buffalo rate and the D & H Buffalo-Albany rate. Finally, a "joint

---

1. Corridor is used here as a shorthand notation for origin-destination combination. For example, a corridor exists between Albany and Chicago.

rate" is a single rate charged to a shipper for transport on a through route. The revenues derived from joint rates are divided between the carriers participating in the through route pursuant to contract. On the Albany-Chicago route described above, for example, a single rate could be charged to shippers. The revenues derived from charging that rate would be divided between Conrail and D & H pursuant to a predetermined formula.

Regulation is also a factor in competition. Prior to the mid and late 1970's, price competition between railroads was considered to be unhealthy for the railroad industry and the consumer. Therefore, the establishment and regulation of rates was the province of the Interstate Commerce Commission ("ICC"). The ICC frequently encouraged or compelled the railroads to establish a system of "equalized joint rates". Under that system, the same rate applied equally over all single and joint routes serving a particular corridor.[2] In addition, a joint rate could not be changed or cancelled except with the concurrence of all carriers who participated in the relevant joint route, or after a lengthy proceeding before the ICC. The ICC also controlled other aspects of the railroad industry, including the imposition of reciprocal switching charges.[3]

The passage of the Railroad Revitalization and Regulatory Reform Act of 1976, Publ.L. No. 94–210, 90 Stat. 31, and the Staggers Rail Act of 1980, Publ.L. No. 96–448, 94 Stat. 1895 ("Staggers Act"), however, changed the face of railroad regulation by the ICC. In the preamble to the Staggers Act, Congress declared it to be the national policy "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101a(1). Among other changes intended to substitute marketplace forces for regulation, the Staggers Act stripped the ICC of all jurisdiction to review rates and charges except in limited circumstances where they fall above or below certain jurisdictional thresholds. *See* 49 U.S.C. §§ 10701a and 10709. In addition, a carrier is now permitted to cancel a joint rate subject to certain exceptions. *See* 49 U.S.C. § 10705a(c).

## II. COMPLAINT

Against the above background, D & H asserts that Conrail has violated Section two of the Sherman Act to the detriment of D & H. D & H claims that prior to Conrail's unlawful conduct, D & H provided an effective competitive alternative to Conrail service throughout many corridors. Conrail's conduct has allegedly interfered with that competition.

### A. *Count I*

D & H first claims that Conrail has monopolized the railroad industry in the Eastern Territory.[4] Paragraph eleven of the complaint asserts, in part:

In the Northeast, Conrail is the only railroad serving more than 2,600 stations with some 61,000 customers. Out of all the railroad stations in Connecticut and New Jersey, for example, Conrail exclusively serves over 75% and 80% respectively. In the Philadelphia and Northern New Jersey areas, Conrail exclusively serves over 98% of the railroad served stations. Any shipper wishing to ship from these captive stations must use Conrail until an open interchange[5] is reached. Conversely, any shipper wishing to ship to these captive stations must

2. Combination rates were not affected.

3. Reciprocal switching is a service whereby one railroad will transport freight cars of another railroad for access to a point served only by the former railroad. The company providing the service does so for a per car fee.

4. The Eastern Territory is a ratemaking territory comprised generally of the New England, Middle Atlantic and Midwestern states to the east of the Mississippi River and the north of (and including) Norfolk and Western Railway's Norfolk to Cincinnati line.

5. An open interchange is a junction between two or more railroads where the railroads maintain through routes.

use Conrail from the last open interchange to the stations served exclusively by Conrail. Any other railroad wishing to transport freight originating at or destined to Conrail's captive stations must deal with Conrail.

Conrail has allegedly exercised monopoly power, unlawfully monopolizing the Eastern Territory, through a series of acts described in paragraph fifteen of the complaint. D & H maintains that these acts were designed to single out routes in a corridor which were most profitable to Conrail, and force out the other routes in competition with Conrail's profitable routes. It is urged that Conrail selectively cancelled participation in joint rates on through routes effective July 25, 1981. When the joint rates were cancelled, the through routes became priced at a combination rate. Because combination rates are apparently higher than joint rates, these through routes, in which smaller railroads such as D & H participated, became disadvantaged competitively. Similar cancellations are claimed to have occurred in October of 1982 and July of 1984. D & H contends that Conrail has also refused to negotiate on the establishment of new joint rates which would be responsive to price competition and market conditions. Further, D & H asserts that Conrail has increased reciprocal switching charges to D & H to make the use of D & H lines prohibitively expensive to shippers, and that Conrail has engaged in other conduct designed to foreclose competition and monopolize the relevant market.

### B. Count II

Count II of the complaint avers that Conrail has "attempted" to monopolize the relevant market in contravention of Section two of the Sherman Act. Paragraph twenty-three of the complaint lists several acts by Conrail which, in combination with those acts listed in Count I and discussed above, allegedly demonstrate Conrail's attempt to monopolize. These acts generally involve Conrail's use of its facilities in such a manner as to delay and impede the operation of D & H trains. For example, paragraph 23(a) provides that Conrail refuels its own trains on a main line used jointly by Conrail and D & H. The refueling purportedly delays priority trains of D & H.

### C. Requested Relief

The complaint demands as relief treble damages pursuant to 15 U.S.C. § 15. The complaint does not provide the basis for damage calculation. Counsel for D & H did explain at oral argument, however, that D & H is seeking damages based on profits allegedly lost as a consequence of Conrail's actions. Trans. at 52–53. D & H also demands injunctive relief prohibiting Conrail from partaking in further anticompetitive conduct and restoring joint rates, among other things, cancelled by Conrail. Finally, plaintiff D & H seeks costs and attorneys' fees associated with the prosecution of this action.

### III. THE MOTION TO DISMISS

Although the motion papers are styled to request dismissal pursuant to F.R.C.P. 12(b)(6), counsel for Conrail has stated at oral argument that defendant does not seek a complete dismissal of this action. Trans. at 4–5. Rather, it claims that D & H cannot obtain relief in either Counts I or II with respect to actions taken by Conrail prior to July 15, 1982, because such relief is barred by the four-year statute of limitations contained in 15 U.S.C. § 15b. Conrail claims further that the acts described in Count II do not constitute attempts to monopolize, but rather violations of state contract or landlord/tenant law. Additionally, Conrail contends that granting the relief requested would unlawfully interfere with the power of the ICC. Finally, Conrail argues that D & H's claims unaffected by the above should be stayed in order to receive the view of the ICC pursuant to the doctrine of "preliminary exclusive" or "primary" jurisdiction.

### IV. DISCUSSION

Despite Conrail's use of the primary jurisdiction doctrine to dispose of D & H claims not eliminated by other arguments,

the court considers the primary jurisdiction issue to be the most comprehensive and important issue presented here. Accordingly, that issue will be considered first.

## A. *Primary Jurisdiction*

■ Conrail must of course recognize that by asserting the doctrine of primary jurisdiction, it does not follow that this court is without jurisdiction to hear the antitrust claims of D & H. In a long line of cases, the Supreme Court has repeatedly rejected the notion that regulated industries are exempt from the antitrust laws. *See e.g. Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945). This is particularly true since the passage of the Staggers Act, which seeks to free rail carriers from regulatory restraint. *See e.g. Cleveland-Cliffs Iron Co. v. I.C.C.*, 664 F.2d 568, 588 (6th Cir. 1981). The deregulation contained in the Staggers Act exposed rail carriers to all kinds of market forces, including the antitrust laws. *Transkentucky Trans. R.R. v. Louisville & N.R.R.*, 581 F.Supp. 759, 764–65 (E.D.Ky.1983).

■ The doctrine of primary jurisdiction is applicable, however, where the courts and the ICC have concurrent jurisdiction over a dispute involving issues "beyond the conventional experience of judges." *Engelhardt v. Consolidated Rail Corp.*, 756 F.2d 1368, 1369 (2d Cir.1985). "The doctrine comes into play when a claim is cognizable in a court but adjudication of the claim 'requires the resolution of issues which, under a regulatory scheme have been placed within the special competence of an administrative body.' " *Hansen v. Norfolk & W. Ry.*, 689 F.2d 707, 710 (7th Cir.1982) (quoting *United States v. Western Pacific R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). In such a case, the court will stay its hand until the agency has applied its expertise to the salient questions. *Engelhardt*, 756 F.2d at 1369.

### 1. *Application of the Doctrine by other Courts*

■ Because there is no fixed formula for the application of the doctrine, a case-by-case factual analysis is required. *Engelhardt v. Consolidated Rail Corp.*, 594 F.Supp. 1157, 1164 (N.D.N.Y.1984, *aff'd*, 756 F.2d 1368 (2d Cir.1985). A survey of the doctrine's application by other courts is instructive. In some cases the courts deferred judicial action in order to obtain a necessary initial determination from an agency so as to avoid the possibility of inconsistent decisions. In *United States Navigation Co. v. Cunard Steamship Co.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed.2d 408 (1932), and *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the plaintiffs challenged price setting agreements between shipping companies as violative of the antitrust laws. If such agreements had been approved by the Federal Maritime Commission, however, they would have been exempt from the operation of the antitrust laws. Rather than risk the possibility of a later inconsistent determination from the Commission, the *Cunard* and *Far East* Courts deferred judicial consideration until the Commission considered the agreements in question. A similar deferral occurred in *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). In *Ricci*, the plaintiff asserted that the defendants had acted pursuant to an unlawful conspiracy, and thereby injured his brokerage business. The Court determined, however, that if the defendants' conduct was approved by the Commodity Exchange Commission there may have been immunity from the application of antitrust laws. *Id.* at 298–306, 93 S.Ct. at 579–582. The Court opined:

We also think it very likely that a prior agency adjudication of this dispute will be a material aid in ultimately deciding whether the Commodity Exchange Act forecloses this antitrust suit, a matter that seems to depend in the first instance on whether the transfer of Ricci's membership was in violation of the Act for failure to follow Exchange rules. That issue in turn appears to pose issues of fact and questions about the scope,

meaning, and significance of Exchange membership rules. These are matters that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry and of the unique marketplace involved in this case. (citations omitted)

*Id.* at 305, 93 S.Ct. at 582. Moreover, the Second Circuit subscribes to the use of the primary jurisdiction doctrine to obtain necessary preliminary decisions from agencies. In *Engelhardt,* three employees of Conrail, formerly employed by the New Haven Railroad (which became part of Penn Central and then Conrail), brought suit pursuant to 49 U.S.C. § 11347 alleging violation of orders promulgated by the ICC in connection with the creation of the Penn Central system. The court thought it proper to have the ICC interpret its own orders:

We simply cannot say with any certainty whether the I.C.C. orders relating to the creation of the Penn Central System were violated by the seniority scheme underlying this dispute. That question, from which flows the resolution of this claim, properly lies within the discretion of the I.C.C.

*Id.* at 1369.

Courts have also deferred to administrative proceedings where such proceedings would narrow and define complex legal and factual controversies. In *Hansen,* the plaintiff, a trucking company, charged defendants, various trucking and rail transportation companies, with violating the tariff requirements of Section 10761(a) of the Interstate Commerce Act, Sections one and two of the Sherman Act, and Section two of the Clayton Act. Central to both the interstate commerce and antitrust claims was plaintiff's allegation that defendants conspired to control the provision of piggyback service [6] and to thereby circumvent applicable ICC tariffs. *Hansen,* 689 F.2d at 709. The court stayed both the interstate commerce and the antitrust claims pending pro-

ceedings by the ICC. In so doing, the court noted:

Piggyback service ... poses difficult transportation policy problems involving the appropriate allocation of services between rail and motor carriers. Because the plaintiff's complaint raises such difficult problems, judicial consideration of this cause must await proceedings by the specialized agency created by Congress to deal with transportation policy—the I.C.C.

*Id.* at 711. Even though the ICC had no jurisdiction over the antitrust claims, the court also stayed such claims pending ICC action on the claims within its jurisdiction. *Id.* at 713. The court determined that the ICC consideration may "narrow or refine the factual issues relating to the plaintiff's antitrust claims." *Id.* Moreover, the court determined that the complaint raised issues regarding the proper relationship between the Interstate Commerce Act and the antitrust laws, and opined that "an I.C.C. determination of whether the Commerce Act has been violated will be of immense aid to the court hearing of the plaintiff's antitrust claims." *Id.*

In *GTE Sprint Communications Corp. v. Downey,* 628 F.Supp. 193 (D.Conn.1986), the plaintiffs sought to enjoin enforcement of a Connecticut state law regulating intrastate communications. The principal thrust of the plaintiffs' argument was that portions of the law intruded into an area of telecommunications preempted by the Communications Act of 1934, 47 U.S.C. § 1 *et. seq.,* and exclusively regulated by the Federal Communications Commission ("FCC"). The court referred the question of preemption to the FCC under the primary jurisdiction doctrine. In so doing, the court noted that the resolution of the preemption issue required extensive findings of complicated and controverted technical facts beyond the conventional experience of judges. *GTE Sprint,* 628 F.Supp. at 195–96.

---

6. Piggyback service involves railroad carriage of containers or vehicles, such as trucks, suitable

for immediate transfer to another mode of transportation.

## 2. Application of the Doctrine to the Present Facts

Conrail asserts that the ICC can and should consider D & H's claims at the outset. Conrail recognizes that these antitrust claims do not fall within the jurisdiction of the ICC. Although the ICC may consider antitrust principles in its determinations, the agency lacks authority to enforce the antitrust laws or even determine if they have been violated. *Transkentucky,* 581 F.Supp. at 767, (citing *McKlean Trucking Co. v. United States,* 321 U.S. 67, 79, 64 S.Ct. 370, 376, 88 L.Ed. 544 (1944)). Conrail asserts, however, that the individual instances of Conrail's allegedly unlawful conduct, such as the 1982 joint rate cancellations, can be considered by the ICC, and that such consideration should precede further judicial action.

There can be no dispute that the ICC can consider whether many, if not all, of the alleged acts of Conrail violate the Interstate Commerce Act and the national rail policy enunciated therein. 49 U.S.C. §§ 10705 and 11103 provide the ICC with the power to prescribe "in the public interest" joint rates and reciprocal switching arrangements. Pursuant to that power, the ICC has promulgated rules, effective December 6, 1985, to govern the handling of the following competitive access issues: cancellation of through routes and joint rates; and prescription of through routes, through rates, and reciprocal switching. *See* 49 C.F.R. § 1144. Accordingly, the ICC can suspend, investigate and/or negate a through route or joint rate cancellation as well as a modification to a switching arrangement where it finds that such modifications or cancellations are contrary to the competition policies of 49 U.S.C. § 10101a.[7] *See* 49 C.F.R. §§ 1144.3, 1144.4 & 1144.5.

The complaint asserts that Conrail's acts of joint rate cancellations and increased reciprocal switching charges *in the aggregate* demonstrate Conrail's monopolization or attempted monopolization of the relevant market, however. The narrow issue facing this court, then, is whether the court should postpone considering Conrail's acts in the aggregate until the ICC has had a chance to consider them individually.

Unlike the facts presented in *Cunard, Far East, Ricci,* and *Engelhardt,* the court need not obtain an initial determination of an administrative agency to guide the application of the substantive law. It is conceivable that every individual act of Conrail's be approved by the ICC and yet in the aggregate violate the antitrust laws as an unlawful pattern of conduct designed to destroy competitors such as D & H. "The mere fact of ... authorization of rates or contracts or other conduct by a regulatory agency does not obviate the possibility that such rates, contracts or conduct, although authorized for one purpose, may be used for another unlawful purpose." *Transkentucky,* 581 F.Supp. at 767–68.

The only justification for deferral, therefore, is to permit the ICC to narrow and define complex legal and factual controversies. There are indeed complex legal and factual controversies presented here. Con-

---

7. 49 U.S.C. § 10101a provides, in pertinent part: In regulating the railroad industry, it it the policy of the United States Government—
 (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

 \* \* \* \* \* \*

 (4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;
 (5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;
 (6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;
 (7) to reduce regulatory barriers to entry into and exit from the industry;

 \* \* \* \* \* \*

 (13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

rail's alleged conduct, for example, must be analyzed in light of changes in national rail regulatory policy. Furthermore, Conrail's actions involve business relationships, terminology, and a geographic expanse with which this court is presently unfamiliar. In the final analysis, however, this court has the responsibility to find the facts and apply them to the law of antitrust. While efforts by the ICC may be helpful to the court in carrying out that responsibility, that aid is overshadowed by other considerations.

■ First, the aid provided by ICC consideration may be minimal. The ICC could, of course, function as a fact finder and summarize the facts that may be relevant to this antitrust action. The parties agree here, however, that as to liability this action is likely to be appropriately disposed of by summary judgment. Trans. at 64–65. The court is confident that it can marshal the facts as adequately from materials submitted on such motions as from ICC documents. Moreover, any legal consideration provided by the ICC may not be suitable to the antitrust analysis. Conrail's Reply Brief includes a copy of Interstate Commerce Commission Decision Number 38676 to demonstrate the type of consideration the ICC could provide D & H's claims. *See* Conrail Reply Memorandum at Appendix A. A brief examination of the decision reveals that it provides little that is pertinent to a traditional antitrust analysis.[8] Second, deferral of this case, which would essentially require the plaintiff to proceed before the ICC, would deprive the plaintiff

of his choice of forum as well as cause substantial delay which could significantly harm the plaintiff's business. Consequently, under the discretion inherent in the doctrine of primary jurisdiction, *see GTE Sprint*, 628 F.Supp. at 195, the court denies Conrail's motion to stay or dismiss the plaintiff's complaint pursuant to such doctrine. Having denied this motion, the court must consider the other arguments advanced by Conrail.

### B. *Attempt to Monopolize*

■ Conrail argues that much of the conduct alleged in Count II concerns alleged disputes between Conrail as "landlord" and D & H as "tenant". Conrail asserts that such conduct cannot be anticompetitive because it is not derived from Conrail's power in the market, or its size. *See* Conrail's Brief at 38–40. This argument has no merit on this motion to dismiss. It is of no import to the antitrust analysis whether the parties stand in relation as landlord and tenant or as other contractors so long as it is appropriately alleged that the defendant's actions were undertaken with the purpose to create or maintain a monopoly. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *see also supra* note 8. Here, Count II adequately alleges that these actions were undertaken to drive out D & H as a competitor. Moreover, whether or not Conrail's conduct was derived from its market power is a question of fact that should not be addressed on a motion to dismiss.

---

**8.** The complaint alleges that Conrail has monopolized or attempted to monopolize the relevant rail market. The law applicable to such allegations is clear. In order to prove unlawful monopolization, the plaintiff must demonstrate the defendant's monopoly power and its willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). To prove an attempt to monopolize, the plaintiff must show

that the defendant employed methods which, though falling short of monopolization, create a dangerous probability of it with the specific intent to destroy competition or build a monopoly. *Buffalo Courier-Exp. v. Buffalo Evening News,* 601 F.2d 48, 54 (2d Cir.1979). The ICC analysis in Decision Number 38676 concentrates primarily on evidence related to transit time, mileage, and fuel consumption associated with joint rate cancellations. Such information would appear, at least at this juncture, to have little impact on the application of the law summarized above.

## C. *Statute of Limitations*

Under Section 4B of the Clayton Act, 15 U.S.C. § 15b, any action to recover treble damages in private antitrust must be commenced within four years after the cause of action has accrued. Conrail asserts that certain portions of D & H's complaint[9] should be dismissed because they allege acts occurring more than four years prior to the commencement of this action. For example, Conrail asserts that the allegations of subparagraphs 15(a) and 15(b) of the complaint, which concern joint rate cancellations effective July 25, 1981, nearly five years before the action was commenced, should be dismissed as time-barred. The question presented is when did the causes of action associated with these pre-limitations acts accrue. Conrail argues that they accrued on the date of the relevant acts. D & H claims, on the other hand, that accrual cannot be fixed at such dates because monopolization constitutes a continuing violation of the antitrust laws.

 D & H's implication that monopolization is always a continuing violation cannot be accepted. First, it is inconsistent with the basic understanding of a monopolization claim. Monopolization involves (1) monopoly power and (2) acts that demonstrate unlawful maintenance or acquisition of that power. *See supra* note 8. Consequently, the *acts* of unlawful maintenance or acquisition have taken on a particular significance in antitrust law. *See,* ABA Antitrust Section, Antitrust Law Developments, 121–39 (2d ed. 1984). To accept the proposition that once such an act has been committed, an action to recover for resulting damages is never barred detracts from that significance.[10] More importantly, D & H's position is not supported by law:

> Continuing antitrust conduct resulting in a continued invasion of a plaintiff's rights may give rise to continually accruing rights of action. It remains clear

nonetheless that a newly accruing claim for damages *must be based on some injurious act actually occurring during the limitations period,* not merely the abateable but unabated inertial consequences of some pre-limitations action. (emphasis added)

*Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 128 (5th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). In other words, where all the damages complained of necessarily result from a pre-limitations act by the defendant, the cause of action does not "continually accrue" into the limitations period. *See Imperial Point Colonnades Condominium v. Mangurian,* 549 F.2d 1029 (5th Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977); *see also Woodbridge Plastics, Inc. v. Borden, Inc.,* 473 F.Supp. 218 (S.D.N.Y.1979).

Consequently, it appears doubtful at this juncture that D & H can recover damages resulting from acts taken by Conrail prior to the limitations period. D & H's position "resembles that of a disappointed patron of the theater, when turned away from the theater at eight o'clock because the performance is sold out, his exclusion occurs at eight, not during the performance or when it concludes at eleven o'clock." *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 71 (9th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979).

 Nevertheless, dismissal is inappropriate. Conrail asks this court to dismiss portions of D & H's claim. Such a piecemeal approach to an antitrust claim is improper. *See Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 697, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). Moreover, facts may be presented which substantiate a determination of a continuing violation. For example, D &

---

**9.** Specifically, paragraphs 15(a), (b), (e), and (g).

**10.** D & H asserts that the four-year-period of 15 U.S.C. 15b functions merely as a limitation of damages. That is, a successful complainant can only recover for damages occurring during the four years prior to the filing of the complaint, regardless of when the acts that caused those damages occurred. Trans. at 33.

H's damages may not *necessarily* result from pre-limitations acts. Timely acts of Conrail might have contributed to the damages associated with pre-limitations acts. *See Imperial Point,* 549 F.Supp. at 1035–44. As a factual question is presented, Conrail's motion to dismiss based on the statute of limitations is denied. *See Highland Supply Corp. v. Reynolds Metals Co.,* 327 F.2d 725, 731–32 (8th Cir.1964).

## D. *Relief*

Conrail finally argues that much of the relief requested by D & H is unavailable in this court. Conrail claims that the doctrine announced in *Keogh v. Chicago & N.W. R.R.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) precludes the award of damages to D & H. In *Keogh,* a shipper's complaint alleged that rates filed with the ICC by the defendants had been fixed pursuant to an agreement prohibited by the Sherman Act. The shipper claimed treble damages measured by the difference between the rates set pursuant to the unlawful agreement and those that had previously been in effect. The Court determined that the shipper could recover no damages:

> The Court reasoned that the ICC's approval had, in effect, established the lawfulness of the defendant's rates, and that the legal right of the shippers against the carrier had to be measured by the published tariff. It therefore concluded that the Shipper could not have been injured in his business or property within the meaning of the [Sherman Act.]

*Square D. Co. v. Niagra Frontier Tariff Bureau,* — U.S. —, 106 S.Ct. 1922, 1926, 90 L.Ed.2d 413 (1986) *(construing Keogh ).*

 The present complaint does not implicate *Keogh,* however. Plaintiff's complaint does not put into issue the lawfulness of the defendant's rates under the Interstate Commerce Act. D & H does not seek damages as a shipper who has been charged unreasonably high rates. D & H seeks to establish that Conrail engaged in a pattern of conduct specifically designed to eliminate D & H as a competitor. The plaintiff's damages will be measured not by the difference between existing rates and some hypothetical rates, but by business losses it has allegedly sustained. Such a measure of damages is perfectly acceptable in an antitrust action. *See e.g. Eastman Kodak Co. v. Southern Photo Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *First National Bank v. British Petroleum Co.,* 324 F.Supp. 1348 (S.D.N.Y. 1971); *Transkentucky,* 581 F.Supp. at 767.

Conrail next argues that injunctive relief is precluded by Section 16 of the Clayton Act, 15 U.S.C. § 26, which permits private injunctive relief in antitrust actions,

> [P]rovided, [T]hat nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of [49 U.S.C. § 1 *et. seq.*] in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.

15 U.S.C. § 26. D & H's request for injunctive relief is broad, and much of it may indeed be barred by 15 U.S.C. § 26. The court is not prepared at this stage of the proceedings, however, to rule out all forms of injunctive relief. *See Transkentucky,* 581 F.Supp. at 768. Consequently, Conrail's motion to strike D & H's claims for injunctive relief is denied without prejudice.

SO ORDERED.